UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11022-RWZ

EDWARD M. McDONOUGH
*As Conservator for Margaret G. McDonough*

v.

FEDERAL INSURANCE COMPANY

MEMORANDUM OF DECISION

September 14, 2012

ZOBEL, D.J.

The sole beneficiary under a life insurance policy (the "Policy") issued by Federal Insurance Company ("Federal"), brings this action to recover accidental death benefits. The policy was provided by the decedent's employer, and plaintiff claims death benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1) (B)(Count I), and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g) (Count II). Both parties have moved for summary judgment.

**I. Background**

These are the undisputed facts. Plaintiff, Edward M. McDonough, is the conservator of Margaret G. McDonough. Ms. McDonough is the sole beneficiary of the Policy. James McDonough (the "insured"), Ms. McDonough's son, died of

cocaethylene[1] intoxication while traveling in Costa Rica for business in February 2008. At some point during the business trip, the insured was taken into custody by the Garabito, Jaco, Costa Rica tourist police on reports that he was disturbing the peace. Approximately one and a half hours after being placed in a holding cell, the insured was found dead lying on his back. An autopsy report by the medical examiner indicated the cause of death was "intoxication with cocaethylene and acute pulmonary edema" and ruled the death "accidental." The report also noted "chronic use of cocaine with small intramyocardium vessels disease and mixed heart disease." In May 2010, defendant denied a claim under the Policy noting "there is no evidence of an accident" and "the circumstances surrounding Mr. McDonough's death ... would be excluded from coverage under [the] Suicide and Intentional Injury exclusion." In June 2010, defendant denied the claim again, and in September affirmed the denial after committee review reaffirming its position that "Mr. McDonough's death was not caused by an accident but rather an intentionally self-inflicted injury."

The parties agree that the insured had voluntarily ingested the cocaine, and they acknowledge that the Policy does not contain an alcohol or drug exclusion provision.

## II. Standards

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56.

---

[1] Active metabolite formed as a result of simultaneous use of cocaine and alcohol. McCance-Katz EF, Price LH, Kosten TR, Jatlow PI; Cocaethylene: Pharmacology, physiology, and behavioral effects in humans; J. Pharmacol. Exp. Ther. 274:215-223 (1995).

2

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation marks omitted).

"When construing undefined words in an insurance policy, a court must give the words used in the contract their plain and ordinary meaning." Merrimack Mut. Fire Ins. Co. v. Almeida, 2004 WL 335189, at *2 (citations omitted). "Courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined. To the exact contrary, straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989). "Ambiguities are resolved against the insurer, who drafted the policy, and in favor of the insured. Thus, if there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) (internal citations and quotations omitted).

### III. Analysis

A district court reviews ERISA claims arising under 29 U.S.C. § 1132(a)(1)(B) de novo unless the benefits plan in question confers upon the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir. 1993) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Here, the parties agree that de novo review is appropriate.

3

### A. Whether Claim Falls Within Grant of Coverage

To carry his burden, plaintiff must establish that the insured's death qualifies as an "accident" under the Policy; once established the burden then shifts to defendant to prove any Policy exclusion. GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995).

The Policy defines "accident or accidental" as: (1) "a sudden, unforseen, and unexpected event", which (2) "happens by chance"; (3) "arises from a source external to an Insured Person"; (4) "is independent of illness, disease or other bodily malfunction or medical or surgical treatment thereof"; (5) "occurs while the Insured Person is Insured under this policy which is in force"; and (6) "is the direct cause of loss."

Defendant does not contest elements (2), (5) or (6). Dispute between the parties centers around whether the insured's death was "unexpected"; whether it arose from a source external to decedent; and whether it was independent of "illness, disease or other bodily malfunction."

#### (1) "Unexpected"

The parties agree that because the Policy does not define the phrase "unexpected," Wickman v. Nw. Nat. Ins. Co., 908 F.2d 1077, 1079 (1st Cir. 1990), supplies the proper rule of interpretation. The ERISA plan at issue in Wickman defined an accident as "an unexpected, external, violent, and sudden event." Id. at 1084-1085. The only term disputed by the parties was "unexpected." The court framed the relevant inquiry as "what level of expectation is necessary for an act to constitute an accident,"

4

and developed a three-tiered analysis guiding such a determination. Id. at 1088. It counseled the fact finder to: (1) start with the reasonable expectations of the insured when the policy was purchased; (2) if the fact finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact finder must then examine whether the suppositions which underlay that expectation were reasonable; (3) if the fact finder finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact finder should then engage in an objective analysis of the insured's expectations- "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." Id.

Plaintiff concedes that "there are no clues regarding what James McDonough thought about his insurance coverage during the early evening just before he died," and states "the record is devoid of all evidence regarding [his] subjective expectations under the Insurance Policy, when he bought it [the policy], or just before he died." Therefore, only the objective analysis inquiry, the third tier, under Wickman is implicated.

The Wickman inquiry is highly dependent on the particular circumstances surrounding the fatal event. In Stamp v. Metropolitan Life Insurance, 531 F.3d 84, 91 (1st Cir. 2008), the First Circuit noted Wickman "does not require a categorical determination that all alcohol [or drug]- related deaths are per se accidental or non-accidental. Rather, it leads us to consider the circumstances of the fatal event in question." The Stamp court also rejected the notion that unless the decedent had the

5

specific intent to commit suicide, the resultant death must be deemed an accident. "[T[he critical determination under Wickman lies in an objective analysis of what the insured reasonably should have expected when he decided to [engage in the fatal activity]." Such objective analysis does not depend on the statistical probability of death; instead, the chief concern is whether "a reasonable person would perceive the likely outcome of the intentional conduct...." Id. at 92.

It is plaintiff's burden to show that "a reasonable person, with background and characteristics similar to the insured, would [not] have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." The record contains either no evidence of or conflicting positions regarding: Medically, how likely is the combined use of cocaine and alcohol to cause a fatal result? At what quantities? How widely known are the risks? Was the insured aware of these risks or did he have prior exposure to, or occasion to know of these risks? How much did the insured ingest on the night he died? How much had he used in the past? With what frequency and results? Thus, it is far from clear a jury would necessarily conclude that on the existing record, a reasonable person with the insured's characteristics would have viewed his death as "highly likely to occur," especially in light of the decedent's history as a seasoned cocaine user. See e.g. Jessen v. CIGNA Group Ins., 812 F.Supp.2d 805, 817 (E.D. Mich. June 21, 2011) (on similar facts court noted "possibility of death [ ] less likely to result from use of heroin by an experienced user when compared to [other risky behavior]" ... and found "record supports an inference that while [decedent] intended to administer heroin, he did not intend to administer a fatal dose of the substance, and it

6

was not objectively unreasonable of him to expect to simply get high – yet stay alive -- as a result of consuming the dosage."). The parties also dispute a material fact - the amount of cocaine the insured ingested. Defendant contends that the decedent ingested "a great deal" of cocaine -- a characterization plaintiff disputes and notes is unsupported by the record. Although the autopsy report highlighted the text and a check mark next to the word "cocaine," the significance thereof is not explained and is contested by the parties. Given these uncertainties, summary judgment on the "unexpected" element for either party is not warranted.

### (2) "Source external to decedent"

The parties also dispute the meaning of "source external to decedent" which is not defined in the Policy.

Defendant proposes two alternative definitions, contending that "although the Policy does not define 'external', a common sense, 'plain meaning' reading suggests that the source must have either been outside the physical boundaries of the insured's body <u>or</u> from a cause other than the insured's own acts or volition." Plaintiff counters that "cocaine and alcohol were not part of [decedent's body], an [sic] accordingly were 'from a source external' to decedent" as cocaine and alcohol "did not naturally occur in James' body." <u>Webster's II New Riverside Dictionary</u> (1996 Revised Edition) defines external as "1. Of, for, or on the outside : exterior. 2. Acting or coming from the outside 3. Apparent from outside ..." Neither the dictionary definition, nor common understanding, in any way, includes a "volitional" component as defendant's second

proposed definition would require. Nor would grafting such a requirement on to the definition comport with the reasonable expectations of the insured.

One can choose on his or her own volition to eat a bunch of grapes yet accidentally choke to death on one, or choose to consume a chicken cutlet (which unbeknownst to the diner is undercooked) and die of salmonella poisoning. The conscious act of eating one or the other would not alone transform an external source into an internal one. The most natural reading of a "source external" to the insured is a source originating "from [ ] outside" the insured's person. Such a definition is consistent with plaintiff's definition and with defendant's first definition.

Where defendant's position goes awry, however, is in its suggested application. Defendant contends that, even under its first proposed definition, once an external source becomes ingested it transforms into an internal source. It states "as to the first [definition], the cocaine and alcohol that led to the death were physically inside the boundaries of Mr. McDonough's body and, thus, quite literally were not external." It would be neither logical nor comport with reasonable expectations to interpret the policy language in a manner that would make chocking on a grape or dying of salmonella poisoning a non-accident, simply because their fatal effects ultimately occur internally. Cocaine and alcohol come from outside the body and thus constitute external sources under the most natural definition.

**(3) "Illness, disease or other bodily malfunction"**

Defendant argues that "acute pulmonary edema" ("APE"), one of the listed causes of death on the autopsy report, is due to disease or bodily malfunction. Disease and bodily malfunction are not defined in the policy.

Defendant does not proffer any suggested definition of "disease" or any evidence that APE would meet such a definition. "Pulmonary Edema" is defined as, "An effusion of fluid into the air sacs and interstitial tissue of the lungs, producing severe dyspnea; most commonly due to left heart failure." <u>Blakiston's Gould Medical Dictionary</u>, 4th Edition, 1131. "Acute" is defined as "1. Sharp; severe. 2. Having a rapid onset, a short course, and pronounced symptoms...". <u>Id.</u> at 23.  In <u>Paulissen v. U.S. Life Ins. Co. in City the City of New York, et al.</u>, 205 F.Supp.2d 1120, 1124 (C.D. California, 2002), the court considered whether a life insurance policy excepting accidents "caused directly, indirectly, wholly in or partly by .... a physical or mental sickness, or treatment of that sickness" covered an insured who died from high altitude induced pulmonary edema. The court found "sickness, disease, and illness have broad, generic definitions," and in light of the principle that definitions are to be narrowly construed in favor of the insured stating "temporary conditions and indispositions are not considered to be diseases." <u>Id.</u> at 1130 (citing <u>Manufacturers' Accident Indemnity Co. v. Dorgan</u>, 58 F. 945, 951 (6th Cir. 1893) ("a mere temporary disorder, that was new or unusual with him, arising out of some sudden or unexpected derangement of the system ... would not be a disease.")). <u>See also</u> <u>Chale v. Allstate Life Ins. Co.</u>, 353 F.3d 742, 749 (9th Cir. 2003) (reversing summary judgment for insurer and granting summary judgment in favor of insured who died of high altitude pulmonary edema noting "someone who is

9

freezing to death or drowning certainly suffers from a physiological abnormality. But in neither case could the affliction be considered so 'established or settled' as to amount to 'disease.' For both disorders, the onset is sudden and the outcome either death or rapid rescue from the brink of death ..."). Here, the medical dictionary definitions support the inference that the <u>acute</u> pulmonary edema was sudden, and there is no evidence it arose from some organic cause rather than from the insured's ingesting of cocaine and alcohol.

Defendant has not established as a matter of law that APE is a disease within the definition of the policy; similarly, the evidence in the record, the medical definitions, and prior case law support plaintiff's ability to show otherwise.

Next, defendant turns to the definition of "bodily malfunction" noting that "when a body performs normally, it is not malfunctioning. When a body reacts to a stimulus in a way that is not normal, it is malfunctioning." However, defendant has not established, as a matter of law, that the normal bodily reaction to the amount of cocaine and alcohol ingested by the insured is different from that actually experienced by the insured.

### B. Whether Exclusion Applies

Finally, defendant argues that, in the event plaintiff can establish coverage, two exclusions nonetheless operate to deny coverage. The first, the "illness, disease or other bodily malfunction" exclusion has already been addressed in the context of the definition of accident above. I now turn to the "suicide or intentional injury" exception.

Defendant says that the ingestion of drugs and alcohol is an intentional self-inflicted injury that is excluded from coverage. It states "seeking euphoric side-effects of

[ ] self-injury does not negate the intentional self-injury." Of note is the fact that the Policy did not exclude death from alcohol or drug use. "Rather than attempting to insert an exclusion by inference, what should be done ... is to have a clause specifically establishing such an exclusion... To eliminate any uncertainty, plan administrators should include an alcohol-related exclusion in all accidental death insurance plans." Stamp, 531 F.3d at 95 (1st Cir. 2008) (internal citations and quotations omitted"). In fact, during the defendant's initial review of the policy, the insurance adjuster made a notation in the file indicating "there is no drug or alcohol exclusion."

While the use of drugs and alcohol may cause some incidental bodily injury to the user, to suggest, that, as a per se rule, every drug and alcohol user intends to injure himself with such use, is divorced from reality. Moreover, the present record includes no evidence of any desire by the insured to commit suicide nor, in any way, intentionally harm himself.

## IV. Conclusion

Plaintiff's motion for summary judgment (Docket # 21) is ALLOWED as to the suicide and accidental injury exclusion provision and is otherwise DENIED. Defendant's cross-motion for summary judgment (Docket # 25) is DENIED.

| September 14, 2012 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |

11